OPINION OF THE COURT
TABLE OF CONTENTS
I. Introduction.756
II. Procedural History .757
*756 III. Scope of Review. 758
IV. Unitary Status. 759
V. Green Factors. 761
A. Student Assignment . 761
B. Faculty and Staff Assignments.:. 766
C. Extracurricular Activities.'. 768
D. Remaining Green Factors.:. 769
VI. Ancillary Relief.... 769
A. In-service Training. 770
B. Reading and Communication Skills. 771
C. Curriculum.'. 772
D. Counseling and Guidance. 773
E. Human Relations.:. 774
F. Discipline.'. 774
VIL Areas of Concern to the District Court and Allocations of the Burden of Proof. 776
VIII Conclusion.
ALDISERT, Circuit Judge.
I. Introduction
This case brings to a close our supervision of more than four decades of litigation designed to desegregate the public schools of Delaware.
However, we do not end our supervision hastily. After the Delaware schools’ rudimentary attempts at desegregation were deemed insufficient by the district court in 1957, and by this court in 1960, judges of this circuit blazed new jurisprudential trails in 1975 by requiring an interdistrict remedy. By 1977 and 1978, the judiciary had fashioned detailed orders for primary and ancillary relief which, together with the factors set forth by the Supreme Court in Green v. County School Bd. of New Kent County, Va., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), constituted the marching orders for the school system.
Still, it was not until almost 20 years .later (and 35 years after this court announced dissatisfaction with an original plan that called for grade-by-grade desegregation over a 12-year period) that the district court could announce that the marching orders had been obeyed: The school system has achieved unitary status by complying in good faith with our detailed desegregation decrees and by eliminating to the extent practicable the vestiges of de jure segregation. This was the ruling of the district court embodied in a judgment entered after a lengthy hearing. The Coalition to Save Our Children (“Coalition”), the representative of the plaintiff class, has appealed. We will affirm.
It is beyond dispute that racism and bigotry continue to tear at the fragile social fabric of our national and local communities, and that our best efforts as citizens are needed to address this problem at many levels. However, as the district court observed in the case at hand, court-supervised school desegregation alone cannot eliminate racial discrimination:
[A]s the years have passed since Brown I and II [Brown v. Board of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) and Brown v. Board of Educ., 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955)], it has become apparent that the school desegregation process has been unable to eliminate or overcome racial discrimination in the “myriad factors of human existence” outside the school environment....
Coalition to Save Our Children v. State Bd. of Educ. of State of Del., 901 F.Supp. 784, 823 (1995) (quoting Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 22, 91 S.Ct. 1267, 1279, 28 L.Ed.2d 554 (1971)). Or as the Court succinctly put it in Swann: “One vehicle can carry only a limited amount of baggage. It would not serve the important objective of Brown I to seek to use school desegregation cases for purposes beyond their scope.... ” Swann, 402 U.S. at 22, 91 S.Ct. at 1279.
In light of this sobering truth, it is all the more important that we write the final chapter in this long period of supervision by the *757 federal courts and release our provisional grip on the administrators and educators of Northern New Castle County, for only in so doing can we permit them to resume their full role in the larger social and political effort to make our nation worthy of the best ideals of its members.[1] The length of the discussion that follows is but one indication of the importance and sensitivity of the task at hand.
II. Procedural History
Historically, Delaware required its public school pupils to attend segregated schools. Del. Const, art. 10 § 2 (1950) and Rev.Code 1935 ¶ 2631. However, even before the landmark decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (Brown I), the Delaware courts ordered the admission of black children to certain schools previously attended only by white children. Belton v. Gebhart, 87 A.2d 862,[2] aff'd 91 A.2d 137 (Del.1952). The Supreme Court consolidated Belton with Brown I and affirmed, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, holding that racial segregation of public school students deprived the minority group children of equal educational opportunities, in violation of the Equal Protection Clause. See Brown I, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). The Court again affirmed Belton v. Gebhart in Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (Brown II), remanding to the Supreme Court of Delaware for further proceedings to require “a prompt and reasonable start toward full compliance” with Brown I and “to effectuate a transition to a racially nondiscriminatory school system ... with all deliberate speed.” Brown II, 349 U.S. at 300-01, 75 S.Ct. at 756.
Yet notwithstanding the end of de jure segregation, the City of Wilmington continued to operate many racially identifiable schools. Accordingly, the district court fashioned an inter-district remedy to eliminate the vestiges of segregation and, faced with the state authorities’ adamant and prolonged refusal to discharge their responsibilities, issued a remedial decree in 1978.[3] The 1978 Order required a 9-3 student assignment plan, which provided that all students would attend formerly predominantly “white” suburban school districts for a maximum of nine years and would spend at least three years in the formerly “black” school districts.
The 1978 Order also directed eight forms of ancillary relief “necessary and essential to ... overcome the vestige effects of de jure segregation,” including: (1) an in-service training program for teachers; (2) an affirmative reading and communication skills program; (3) new curriculum offerings; (4) a nondiscriminatory counseling and guidance program; (5) a human relations program; (6) codes of conduct providing for nondiscriminatory discipline; (7) the reassignment of faculty and staff; and (8) nondiscriminatory guidelines for construction and maintenance of school buildings. Evans v. Buchanan, 582 F.2d 750, 770-774 (3d Cir.1978) (in banc).
*758 In 1981, the district court permitted the state to reorganize the judicially-created school district into the current four districts — Brandywine, Christiana, Colonial and Red Clay. Evans v. Buchanan, 512 F.Supp. 839 (D.Del.1981). In so doing, Judge Schwartz asserted that, notwithstanding the continued existence of “problems that may be characterized as vestige effects of de jure segregation, ... [the] four-district plan is viewed as a good faith effort to respond to repeated judicial invitations for appropriate State authorities to come forward with then-own meaningful solutions to vexing problems.” Id. at 863, 874. However, because Judge Schwartz found the “effort [to have] fallen short of the mark in the critical area of pupil assignment,” he deferred for 60 days any order regarding the State Board’s motion for modification of the desegregation decree in order to encourage “curative legislation” on the matter. Id. at 872-74.
In 1990, Judge Schwartz made a specific finding that one of the districts (Red Clay) had failed to comply in good faith with the 1978 order. Coalition to Save Our Children v. Buchanan, 744 F.Supp. 582, 587-93 (D.Del.1990). Judge Schwartz stated that “the vestiges of prior official segregation [had not] been eradicated ‘root and branch’ from either the Red Clay District as a whole or from its student assignment patterns.” Id. at 587. Indeed, Judge Schwartz found that the record was “replete ... with evidence of delay, obfuscation, and recalcitrance on the part of the Red Clay Board with respect to remedying the racial disparities” in that district. Id. at 592-93.
In 1991, Judge Schwartz stated that, notwithstanding the Red Clay District’s “technical compliance with this court’s orders,” he again had “very grave doubts concerning the [Red Clay] Board’s good faith compliance with the spirit of desegregation,” and thus could “not make a finding that the Red Clay District [was] operating in compliance with the Equal Protection Clause.... ” Coalition to Save Our Children v. State Bd. of Educ., 757 F.Supp. 328, 349-350 (D.Del.1991).
Four years later, upon motion by the Delaware State Board of Education[4] for a declaration of “unitary status,” the district court concluded:
that the defendants have complied in good faith with the desegregation decrees issued in this litigation, that the defendants are unlikely to return to the segregative practices of their predecessors, and that the vestiges of past discrimination have been eliminated to the extent practicable.
Coalition, 901 F.Supp. at 823-824. The opinion accompanying the order set forth 308 factual findings, which discussed: (a) compliance with what have become known as Green factors (as originally suggested in Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968)) — student assignment, faculty and staff assignment, transportation, extracurricular activities, and facilities; (b) compliance with the ancillary relief provisions, endorsed by this court sitting in banc, see Evans v. Buchanan, 582 F.2d at 769-74; and (c) student achievement, special education and dropout rates, which the district court labelled “Areas of Concern.” See Coalition, 901 F.Supp. at 818-22. Appellant conceded compliance with two of the Green factors (transportation and facilities) and one of the ancillary relief provisions (also concerning facilities).
The district court had jurisdiction under 28 U.S.C. § 1331 (1988). We have jurisdiction pursuant to 28 U.S.C. § 1291 (1988). Appeal was timely filed under Rule 4(a), Federal Rules of Appellate Procedure.
III. Scope of Review
The Coalition’s appeal presents us with three fundamental questions for consideration: first, whether the district court properly concluded that the four school districts of Northern New Castle County achieved unitary status by complying in good faith with the desegregation decree and by eliminating to the extent practicable the vestiges of past discrimination; second, whether the *759 district court properly allocated to Appellant the burden of proving that certain racial disparities in student performance are proximately related to de jure segregation; and third, whether the district court properly excluded certain expert testimony proffered by Appellant.[5]
The appeal to this court from the order declaring unitary status tracks a very narrow compass. Because the district court’s finding that the school districts have achieved unitary status is factual, our review of that finding is limited to the clearly erroneous standard. Vaughns by Vaughns v. Bd. of Educ. of Prince George’s County, 758 F.2d 983, 990 (4th Cir.1985); United States v. Texas Educ. Agency, 647 F.2d 504, 506 (5th Cir.1981), cert. denied, 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982); Keyes v. School Dist. No. 1, Denver, Colo., 895 F.2d 659, 666 (10th Cir.1990), cert. denied, 498 U.S. 1082, 111 S.Ct. 951, 112 L.Ed.2d 1040 (1991); Jacksonville Branch, NAACP v. Duval County School Board, 883 F.2d 945, 952 n. 3 (11th Cir.1989). A finding of fact is clearly erroneous only if the court has “the definite and firm conviction that a mistake has been committed.” United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Further, “[i]t is the responsibility of an appellate court to accept the ultimate factual determination of the fact-finder unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive eviden-tiary data.” Krasnov v. Dinan, 465 F.2d 1298, 1302 (3d Cir.1972).
We have plenary review of all questions of law. This includes a district court’s choice, interpretation and application of the law to the historical facts. Louis W. Epstein Family Partnership v. Kmart Corp., 13 F.3d 762, 765-66 (3d Cir.1994). Accordingly, this court undertakes plenary review of the district court’s allocation of the burdens of proof.
Finally, we review the district court’s determination of the admissibility of expert testimony for abuse of discretion. United States v. Theodoropoulos, 866 F.2d 587, 590 (3d Cir.1989).
IV. Unitary Status
The primary legal issue before us is whether the Northern New Castle County school districts have fulfilled their affirmative duty to eliminate the former dual school system. The ultimate end to be brought about by a desegregation remedy is “a unitary, nonracial system of public education.” Green, 391 U.S. at 436, 88 S.Ct. at 1693. A school system achieves this unitary status when it no longer discriminates between school children on the basis of race. See id. at 442, 88 S.Ct. at 1696. And a school system no longer discriminates among school children on the basis of race when it affirmatively has eliminated all vestiges of state-imposed segregation. Id. at 435, 437-38, 88 S.Ct. at 1692-93, 1693-94 (school board charged with affirmative duty to eliminate racial discrimination “root and branch”); Swann, 402 U.S. at 15, 91 S.Ct. at 1275 (“the *760 objective today remains to eliminate from the public schools all vestiges of state-imposed segregation”). Thus our task, simply put, is to determine whether the district court clearly erred in finding that the vestiges of de jure segregation have been eliminated in the Brandywine, Christiana, Colonial and Red Clay school districts. Green, 391 U.S. at 435, 88 S.Ct. at 1692-93; see also Missouri v. Jenkins, — U.S. -, -, 115 S.Ct. 2038, 2055-56, 132 L.Ed.2d 63 (1995).
A critical starting point in identifying vestiges of discrimination is the degree of racial imbalance in the school districts. This inquiry is fundamental, because under the former de jure regime, racial exclusion was both the means and the end of a policy motivated by disparagement of, and hostility towards, the disfavored race. The Court’s 1968 opinion in Green squarely addressed this issue, noting that “[t]he pattern of separate “white’ and ‘Negro’ schools ... established under compulsion of state laws is precisely the pattern of segregation to which Brown I and Brown II were particularly addressed.” Green, 391 U.S. at 435, 88 S.Ct. at 1693. However, the Green Court also made clear that in examining the problem of racial imbalance in our schools, we are to look “not just to the composition of student bodies ... but to every facet of school operations — faculty, staff, transportation, extracurricular activities and facilities.” Id.; see also Swann, 402 U.S. at 18, 91 S.Ct. at 1277 (the Green factors are “among the most important indicia of a segregated system.”) Because compliance with Green factors is a condition precedent to unitary status, we will survey each of those factors here.
Nevertheless, the Green factors, which address racial imbalance, are not the only criteria by which we are to evaluate whether the school districts have achieved unitary status. We must also consider the eight programs of “ancillary remedial relief” prescribed by this court in 1978, including: (1) an in-service training program for teachers; (2) an affirmative reading and communication skills program; (3) new curriculum offerings; (4) a nondiscriminatory counseling and guidance program; (5) a human relations program; (6) codes of conduct providing for nondiscriminatory discipline; (7) the reassignment of faculty and staff; and (8) nondiscriminatory guidelines for construction and maintenance of school buildings. Evans v. Buchanan, 582 F.2d at 769-74. Thus we will survey compliance with these ancillary relief measures as well.
By considering both the Green factors and the eight measures of ancillary relief ordered by this court in 1978, we honor the mandate set forth by the Supreme Court in Dowell that a school board under federal supervision “is entitled to a rather precise statement of its obligations.” Bd. of Education of Okla. City Public Schools, Indep. School Dist. No. 89, Oklahoma County, Okl. v. Dowell, 498 U.S. 237, 246, 111 S.Ct. 630, 636, 112 L.Ed.2d 715 (1991) (citing Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976)). Together, the Green factors and the ancillary remedial relief measures constitute these obligations, and thus precisely frame our inquiry as we determine whether the district court properly ordered the withdrawal of federal supervision. The essence of that inquiry recently was articulated by the Supreme Court:
whether the [constitutional violator] ha[s] complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable.
Freeman v. Pitts, 503 U.S. 467, 492, 112 S.Ct. 1430, 1446, 118 L.Ed.2d 108 (1992).
Given the Court’s recent assertion that federal supervision of local school districts “ ‘was intended as a temporary measure to remedy past discrimination,”’ Jenkins, — U.S. at -, 115 S.Ct. at 2049 (quoting Dowell, 498 U.S. at 247, 111 S.Ct. at 637), we underscore that the phrase “to the extent practicable” implies a reasonable limit on the duration of that federal supervision. Indeed, to extend federal court supervision indefinitely is neither practicable, desirable, nor proper.
We are keenly aware that, for as long as we have imposed federal supervision on local school boards, those bodies have suffered the loss of their defining function — control over *761 their own schools. Thus in the present matter the citizens of the New Castle school districts have been denied for nearly 20 years what the Court has described as the “vital national tradition” of “local autonomy of school districts.” Freeman, 503 U.S. at 490, 112 S.Ct. at 1445 (quoting Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 410, 97 5.Ct. 2766, 2770, 53 L.Ed.2d 851 (1977)). Additionally, we appreciate the extended social and economic burdens that continued supervision would impose on generations of innocent school children and their families. The reality of these burdens becomes clear when we consider that a child who entered first grade in one of the Northern New Castle County school districts in 1976 under federal court supervision is now 26 years old, and possibly a parent with a child of his or her own in the same judicially-controlled school system.[6]
Our concern for the autonomy of local school systems and their members is consistent with the established jurisprudence of desegregation: a fundamental purpose of our mandate to eliminate the dual system has been to encourage local school districts independently to provide high-quality educational opportunities for all students, a state of affairs made possible only in “a unitary, nonracial system of public education.” Green, 391 U.S. at 436, 88 S.Ct. at 1693. Were we to allow federal supervision to continue after a finding that the school districts have complied with our desegregation mandate, we would effectively preclude those school districts from achieving that goal. In sum, we cannot reconcile the prospect of indefinite federal supervision of local school districts with the ultimate purpose of that supervision' — to foster the creation of autonomous, racially balanced school systems. Accordingly, we will remain attentive to the Supreme Court’s repeated instructions that such supervision be “temporary” and “transitional.” See, e.g., Jenkins, — U.S. at -, 115 S.Ct. at 2049; Dowell, 498 U.S. at 247, 111 S.Ct. at 636-37.
With these teachings in mind, we turn now to the district court’s analysis in this ease.
V. The Green Factors
The fundamental issue before the district court was whether the desegregation measures taken by the school districts had effectively eliminated to the extent practicable the vestiges of the former dual school system. In addressing this issue, the district court began by scrutinizing various educational factors initially identified by the Court in Green: student assignments, faculty, staff, facilities and resources, transportation, and extra-curricular activities. Green, 391 U.S. at 435, 88 S.Ct. at 1692-93. We address the district court’s consideration of each of these factors in turn.
A. Student Assignment
Because the crux of the original constitutional violation was the legalized system of segregated schools, the traditional remedy for the violation was to desegregate the schools through student reassignment. Accordingly, we ordered the consolidation of urban and suburban school districts. See Evans v. Buchanan, 582 F.2d at 759 n. 5 (quoting Evans v. Buchanan, 435 F.Supp. 832, 838-39 (D.Del.1977) (footnotes omitted)). The State Board and districts not only have adhered to the requirements of our student assignment order, but also have attempted to maintain a racial balance by consolidating districts, redrawing attendance zones, and instituting the busing of thousands of students.
Indeed, after the hearing below on the Appellees’ motion for unitary status, the district court found that the schools in these districts were “among the most racially balanced schools in the United States.” Coalition, 901 F.Supp. at 799. The court’s conclusion finds ample support in the record from the testimony of school desegregation expert Dr. Christine Rossell. Using an “index of *762 dissimilarity,”[7] Dr. Rossell compared the racial balance in the four districts to a national sample of 76 similar districts, analyzing both the percentage of students in schools with certain variances and the percentage of schools themselves within certain variances.
Dr. Rossell observed that, as measured against this index, the four Northern New Castle County school districts have achieved “close to perfect racial balance.” Further, on the basis of her full analysis, Dr. Rossell concluded that these districts “are much less racially imbalanced than ... [the] national comparison group.” JA 568; see also Coalition, 901 F.Supp. at 797. Because the district court’s finding of racial balance' rests on Dr. Rossell’s thorough analysis, it is not clearly erroneous. See Krasnov, 465 F.2d at 1302 (an appellate court must “accept the ultimate factual determination of the fact-finder unless that determination ... is completely devoid of minimum evidentiary support displaying some hue of credibility ... ”).[8]
Appellant does not contest the findings of racial balance among schools,[9] but argues nonetheless that segregation persists within those buildings, in classrooms and programs. More specifically, Appellant contends that black students are over-represented in certain classes, such as special education, and under-represented in others, such as gifted and advanced placement classes. However, we are mindful that in Milliken v. Bradley, 418 U.S. 717, 740-41, 94 S.Ct. 3112, 3125, 41 L.Ed.2d 1069 (1974), the Court held that the Constitution “does not require any particular racial balance in each school, grade or classroom.” See also Oliver v. Kalamazoo Bd. of Educ., 640 F.2d 782, 809 (6th Cir.1980) (rejecting notion that school system is not unitary if black students are over- or under *763 represented in various academic courses). Moreover, the district court actually made 19 findings concerning the circumstances of student assignments in the classrooms, concluding that classroom balance throughout the districts was exemplary. Coalition, 901 F.Supp. at 800 (measured against a national sample, classroom imbalance in Northern New Castle County was one-third to one-half that of other schools). We review these findings for clear error.
First, although the district court’s findings of classroom racial balance exclude special education classes,[10] there is no clear error. In our 1978 desegregation order we expressly excepted “students presently attending and who in the future may attend ... special education school facilities, and such other similar special school facilities as presently exist or may be hereafter established....” JA 128 (Evans v. Buchanan, 447 F.Supp. 982, 1013 (D.Del. Jan. 9, 1978)). The rationale for this exception is obvious and compelling: students — black or white — should not be mainstreamed (ie., denied special education meant to address special learning needs and problems) merely to effect a racial balance.
Appellant is also unpersuasive in asserting that students are placed in special education programs (such as “intensive learning centers”) simply because they are black. Although in each of the four districts the percentage of black students in special education programs exceeds the percentage of blacks in the overall student population,[11] the record demonstrates that the school districts classify students based on neutral, non-diseriminato-ry state and federal criteria. JA 829-34. Additionally, the districts make periodic reevaluations of special education students to determine when they can return to regular classes. Id. Placement is not mandatory, because at several junctures, parents are empowered to reject the school’s recommendation to place their child in special education classes. JA 830, 832-33. Moreover, we note that the Appellee State Board has created numerous statewide special education task forces; has authorized five comprehensive studies relating to special education; and thoroughly has investigated intervention strategies, mainstreaming and the application of selection procedures. JA 1223,1243.
The Appellees’ efforts to improve racial balance within these programs not only are commendable, but successful. Indeed, in three of the four districts, the racial imbalances have declined.[12] Although we might hope — even expect — that this imbalance will soon disappear,[13] the mere fact that black students remain over-represented in special education classes does not make clearly erroneous the district court’s finding of unitary status. Given that Dr. Reschly, in summarizing his comprehensive analysis, concluded that in these school districts “special education is not used as a means to separate students by race,” Coalition, 901 F.Supp. at 821; JA 839, we will accept the court’s finding on this issue. See Krasnov, 465 F.2d at 1302 (standard of review).
Similarly, Appellant argues that the district court’s findings with regard to classroom assignment are clearly erroneous because black students are under-represented in non-special education classes. This argument relies on, inter alia, the district court’s finding 47: “[tjhere is evidence that among *764 high school students who achieve identical testing scores, black students were more likely to be placed in the lower level class than were white students.” Coalition, 901 F.Supp. at 801 (footnote omitted); JA 1385; JA 4249; JA 4305-07. To be sure, this finding is potentially troubling, suggesting on its face that black students may have been segregated from white students of equal testing aptitude. However, we must consider this finding in the full context in which it was examined and presented by the district court. Thus we must consider that in footnote 30, which accompanies this finding, the district court noted that “[t]he comparison apparently does not include academic achievement as measured by course performance, or whether such placement was requested or required.” Id. Because this comparison relied on testing aptitude alone, rather than considering as well the important factor of academic achievement based on course performance, and because it is not clear whether the placement at issue was requested or required, we do not consider finding 47 to be evidence that black students have not received equal opportunity, nor can we reasonably conclude that the district court, upon its careful examination, clearly erred.
We observe also finding 48, which states that “[o]n the other hand, the percentage of minorities enrolled in honors and AP classes who scored over the 75th percentile in reading or math in the spring of 1993 is slightly greater than that of whites in all 4 school districts.” Coalition, 901 F.Supp. at 801; JA 6259. Although this finding could, as urged by Appellant, give rise to an inference that blacks must perform at a higher level than whites in order to be placed in honors and AP classes, that is not the sole inference that could be drawn from so limited, and thus malleable, a sample. Indeed, on the basis of finding 48 alone we may just as reasonably infer something quite different: that the school districts’ good faith efforts to desegregate have paid off in terms of the improved testing performance of black students.
In any event, our task here is not to engage in such broad speculation, nor to choose among possible inferences from the data; rather, we are to inquire whether the district court’s determination of the districts’ unitary status was clearly erroneous. To accord this finding its proper value, therefore, it must be considered in the context of other, related findings. This the district court did. Indeed, in view of the district court’s copious research, we are assured that the court interpreted this finding in the proper light in determining that the districts have achieved unitary status.
At the urging of Appellant, we also have examined carefully the district court’s finding 36, which states that “[t]he extent to which elementary and middle school students are placed in classes according to their ability is unclear from the record.” Coalition, 901 F.Supp. at 800; JA 4214-21. This finding means little on its own, for it represents merely that there is uncertainty in the record about how elementary and middle school students are placed in classes according to their ability. Indeed, without further amplification, we are not persuaded to conclude that this statement cuts against the court’s determination regarding the districts’ good faith efforts to eliminate de jure segregation. Again, we are required to place this finding in context, bearing in mind that because few elective classes or courses are available to students at the elementary and middle school levels, the selective process for students is far more meaningful at the high school level. Thus we must consider finding 36 in light of findings 39, 40 and 45.
Finding 39 describes the high school class selection process as involving “class presentations by guidance counselors, booklets with course descriptions, application by students in consultation with family, individual guidance from guidance counselors, and teacher input.” Coalition, 901 F.Supp. at 800; JA 755-56, 771-72, 851-54, 863-66. Not only is high school class selection the product of these various deliberations, but, according to finding 40, “[t]he parents and student have the ultimate say in the level to which the student is assigned.” Coalition, 901 F.Supp. at 800; JA1383.[14]
*765 And although finding 36 indicates that the record is unclear on how elementary and middle school students are placed in classes according to their ability, finding 45, when considered in its entirety, provides detailed information about the class placement of high school students as set forth in the margin.[15]
Accordingly, when we consider Finding 36 in the context of these other relevant findings, we find unavailing the contention that finding 36 provides significant evidence that minority students have not received an equal opportunity to succeed in the pertinent school districts. The district court’s multiple findings on this particular issue suggest that the court did indeed consider “every facet of school operations” in determining that the districts have achieved unitary status.
Finally, we note finding 49 of the district court’s opinion, which states that “[t]here is evidence that lower levels of instruction may not encourage achievement and may adversely affect the ability of a student to attend college.” Coalition, 901 F.Supp. at 801; PX 2262 at 82; PX 2265. As with the foregoing findings, although this finding may be considered troubling on its face, alone it is neither definitive nor substantial enough to show clear error in the district court’s determination of unitary status. The mere finding that evidence exists “that lower levels of instruction may not encourage achievement and may adversely affect the ability of a student to attend college,” id., does not establish anything specific about whether that putative problem is related to disparate educational opportunity or treatment according to race.
Of course, this finding is obvious and indisputable as far as it goes: when students receive lower levels of instruction, they are less likely to feel encouraged to achieve and thus will be less likely to attend college. Yet this truism merely serves to underscore the more fundamental question at issue here — on what basis are students placed in “lower levels of instruction”?' As we already have made clear, that basis was not racially discriminatory; the record does not support the claim that students of one race are afforded college preparation opportunities (advanced placement classes, counseling, help in preparing for college placement exams) that students of another race are not.[16]
*766 Thus although the finding that “lower levels of instruction may not encourage achievement” is problematic, especially when viewed in isolation, yet when considered in relevant socio-economic context, this statement of mere possibility cannot be regarded as proof that the district court clearly erred in determining that the school districts have achieved unitary status.[17] The district court dutifully presented this finding in combination with many others and, after carefully analyzing these findings in their totality, declared that “there is no credible evidence linking any current racially identifiable conditions to the prior violation” Id. at 823 (footnote omitted).
This, too, must be said. Although the Constitution requires that all of its citizens have equal access to the pursuit of education, and that they be given equal breaks while attending school, it does not insist that they all finish even. The proper test under the Constitution is equality of opportunity, not of results. On this point we would do well to recall Edmund Burke’s pithy formulation: “[A]ll men have equal rights, but not to equal things.” [18] And indeed, Appellant articulated its commitment to this principle at oral argument: “[w]e have never suggested that the measure here is ultimate equal outcomes.”[19]
That everyone does not finish even is tragic, of course, but it does not amount to a constitutional violation. Nor does it violate the school districts’ mandate regarding student assignment under Green. Accordingly, we conclude that the district court properly determined that, as to student assignment, the districts achieved unitary status through good faith compliance with the requirements of the 1978 Order.
B. Faculty and Staff Assignments
Before the 1978 consolidation, the vast majority of black administrators and teachers served two predominantly black districts. In September 1978, the districts reassigned faculty, administrative and other certificated staff in all eleven districts.[20] The evidence presented at trial demonstrated that the districts now have balanced their faculties to a degree that is virtually unprecedented among those school districts in this country that operate under court orders.[21] The district *767 court found that the districts closely monitor the racial composition of their faculties and do not hesitate to block transfers and to make reassignments, overriding seniority where necessary, to ensure diverse racial representation at each school. Coalition, 901 F.Supp. at 802-04. The record testimony of senior administrative officials from each of the four districts supports these findings.[22]
Appellant does not refute either the district court’s calculations or its conclusion of racial balance among the faculties, but nonetheless argues that the district court’s finding that the vestiges of de jure segregation have been eliminated to the extent practicable is clearly erroneous because the overall percentage of minority teachers within the districts has declined by two or three percent since 1982. Appellant’s Br. at 10. This gradual decline does not indicate clear error, however, because the shortage of minority teachers in the four school districts is not a vestige of de jure segregation in Northern New Castle County, but rather a manifestation of an unfortunate contemporary national trend. Indeed, even Appellant’s expert testified that there is a critical shortage of black teachers in the public schools. JA 1167-68 (the number of black students graduating from colleges in the United States with bachelor degrees in the field of education has declined); see also Freeman v. Pitts, 503 U.S. 467, 482-83, 112 S.Ct. 1430, 1441-42, 118 L.Ed.2d 108 (1992).
The record further reveals that, notwithstanding the shortage of available faculty, the districts hired minority candidates at rates two to four times greater than the available percentage of minorities in regional and national pools. JA 6566. This is attributable in part to the extensive affirmative minority recruitment efforts of each of the four school districts. For example, the Brandywine district has sought to expand its pool of potential minority hires by recruiting not only teachers who have received a degree in education from a 4-year program, but teachers who have received their B.A. or B.S. degrees in fields other than education and have prior teaching experience. JA 620. The Christiana district has attempted to recruit minority teachers by sending announcements to predominantly and historically black universities, by attending career days at predominantly black universities, and by hiring minorities as paraprofessionals. JA 603. The Colonial district has assembled a task force to address minority faculty representation. JA 633.[23] And in the Red Clay district, occasionally a faculty position will be held open until a minority candidate is found. JA 624. Based on this record, the court did not clearly err in finding that the school districts had demonstrated good faith efforts to integrate the faculties of the schools.
We turn, then, to the racial balance among the “non-professional” or “classified” staff, which includes bus drivers, bus aides, secretarial and clerical positions, paraprofessionals, custodial employees, and food service workers.[24] The undisputed evidence of rec *768 ord establishes that the school districts have attempted to use the hiring process to improve racial balance on the staff as new openings have materialized. For example, Brandywine recruits minority staff through community channels, focusing on community centers, neighborhood churches and community groups in minority areas. JA 621. Similarly, Christiana recruits through community newsletters, community centers, and by “word of mouth.” JA 603.
Appellant concedes that the districts have made such efforts, but argues that the districts have not reassigned the staff to maximize facial balance.[25] The district court found that it would be impractical for the districts to reassign these employees in order to attain greater racial balance. We agree.
Food service workers, for example, earn approximately $3200-$4300 per year, working approximately three hours a day. JA 605. Generally, these employees work close to where they live. Transferring them to a distant workplace that would require a long commute simply is not feasible for the salary they receive. Id. Secretarial and clerical personnel would experience a similarly negative economic impact. Id. Even Appellant’s expert acknowledged that forced reassignment of these part-time, low-wage employees could create hardships on these workers with respect to child care, commuting time, distance from work and expenses. JA 1105. Accordingly, it was not clearly erroneous for the court to conclude that the districts have eliminated to the extent practicable any residual racial identifiability in the schools with respect to these employees.
We carefully have considered Appellant’s contentions with respect to faculty and staff assignment, and we conclude that there was no clear error in the district court’s findings.
C. Extracurricular Activities
Appellant contends that the districts have not eliminated the vestiges of de jure segregation from their extracurricular activities. It is undisputed, however, that all extracurricular activities within the four districts are open to students of all races.[26] All eligibility requirements are race-neutral, and district officials encourage all students, regardless of race, to participate in a wide range of extracurricular activities.[27]
Nevertheless, Appellant argues that the districts must also eliminate any racial identi-fiability that exists within each of these activities. In findings 98-100, 109-110, 118 and 125-128, the district court indicated that, unfortunately, there exist a substantial number of racially identifiable extracurricular activities throughout the four districts. We cannot, however, expect a school district to compel or deny student participation in non-compulsory extracurricular activities merely to effect a racial balance.
The four districts have removed financial and transportation barriers to participation. JA 1164. Moreover, each of the districts has demonstrated good faith efforts to reduce the racial identifiability of their activities through experimental programs. For example, the Brandywine district invites all eighth graders and their parents to the high schools to meet representatives from the activities, JA 753; Christiana announces upcoming activities in newsletters and physical education classes, JA 740; middle schoolers in Colonial are recruited to participate in activities when they enter high school, JA 743; and in Red Clay, coaches recruit students and expose them to various sports through the physical education curriculum, JA 680.
We believe that a school district’s extracurricular activities are unitary if they “are available to all students within the School *769 District regardless of race.” Singleton v. Jackson Mun. Separate Sch. Dist., 541 F.Supp. 904, 908 (S.D.Miss.1981); see also Swann, 402 U.S. at 18, 91 S.Ct. at 1277 (“With respect to such matters as ... extracurricular activities,” it may be enough “to eliminate invidious racial distinctions.”). School districts need not “show equal participation.” Lockett v. Board of Educ. of Muscogee County, No. 991 at 55 (M.D.Ga. Nov. 18, 1994) (citing Quarles v. Oxford Municipal Separate School Dist., 868 F.2d 750, 757 (5th Cir.1989)). Accordingly, we conclude that the record supports the district court’s finding that the districts have eliminated to the extent practicable from their extracurricular activities the vestiges of past de jure discrimination.
D. Remaining Green Factors (Transportation and Facilities)
There is no dispute among the parties concerning the two remaining factors outlined in Green.[28] Specifically, transportation is provided on a non-discriminatory basis. Additionally, the districts successfully have remedied the distinctions between the facilities of the formerly black and formerly white schools.
VI. Ancillary Relief
The 1978 order of this court required the implementation of eight specific programs ancillary to the 9-3 pupil assignment plan. The order required the districts to:
1) formulate and implement a comprehensive in-service training program for teachers, administrators and other staff in order to train personnel to cope with the desegregation process;
2) institute an affirmative reading and communication skills program, which does not resegregate the pupils, in order to remedy the effects of the past discrimination;
3) provide curriculum offerings and programs which emphasize and reflect the eultural pluralism of the students, and all instructional materials, texts and other curriculum aids shall be free of racial bias;
4) institute an effective and nondiserimina-tory counseling and guidance program. The counseling and guidance program must insure that students are counseled on a racially nondiscriminatory basis concerning all programs available in the area of work opportunities and opportunities for a college education;
5) provide an appropriate human relations program ... [designed] to protect the individual dignity of students and teachers and to prevent racial myths and stereotypes from prevailing in schools undergoing desegregation;
6) develop ... a code of rights and responsibilities ... provid[ing] for racially nondiscriminatory discipline and ... containing] provisions to insure each student in the desegregation area procedural and substantive due process required by existing law. Such a code will help to provide equal educational opportunity to all students by protecting them from unreasonable, discriminatory, and arbitrary rules; and the Board shall not administer the code on a racially selective or otherwise biased basis;
7) reassign faculty, administrative and other staff personnel to insure that schools do not retain their former racial identity through racially identifiable faculty and staff assignments; [and]
8) establish and enforce nondiscriminatory guidelines for new construction, review of building needs and the appropriateness of each proposed building project or school closing.
JA 128-30; see also 447 F.Supp. at 1014; see also Evans v. Buchanan, 582 F.2d at 771-73.
The district court offered more than 180 factual findings in detailing the school districts’ implementation of these ancillary relief *770 provisions. In the first four years alone, more than $18.8 million in federal desegregation project grants were used to pay for human relations specialists, home-school liaisons, reading resource teachers and in-service programs. The state and the districts maintained these programs even after the transition to a desegregated system. And significantly, from 1978 until the unitary status petition was filed, Appellant never complained to the court of any failure to comply with any of the ancillary relief provisions. Of these eight, the last is undisputed, and the seventh we have addressed in our discussion on compliance with the Green factors. Thus here we will review the district court’s findings on the first six of these ancillary measures.
A. In-Service Training
The district court found that all four districts offered a rich array of in-service programs for their faculty, and that, although the focus of these programs no longer is desegregation, all four districts continue to offer in-service training on desegregation, race equity and multieulturalism. Coalition, 901 F.Supp. at 809. Appellant contends that the district court’s findings are clearly erroneous because two of the Appellant’s experts testified that the in-service training was inadequate. Appellant’s Br. at 25. But a reviewing court’s role is not to pick and choose isolated snippets of evidence. Rather, we must decide, after viewing the record as a whole, whether there is evidentiary support for the district court’s findings. Such support is present; accordingly, there is no clear error.
In January 1978, a team from the districts drafted a statement listing several management goals for the in-service training of the, faculty, staff and administration. The first goal — “[t]o orient the instructional staff to the curricular and instructional process”— was accomplished through the Center for Conflict and Desegregation at the University of Pittsburgh the following month. JA 948-49, 4373, 4376-77. In addition, the team responsible for planning in-service training also realized at least three other goals, that year.[29] Further, in 1978, an Office of In-Service Activities was established and staffed .by two full-time personnel, JA 951-52, and all programs relating to desegregation were mandatory for faculty, staff and administrators. JA 961-62. Finally, even Appellant’s expert testified that the in-service programs offered by the state at the time of desegregation complied with the 1978 order. JA 1140, 1170.
The record similarly supports the district court’s finding that the districts have continued in-service training programs since the 1978 order. For example, the district court heard evidence that from 1981 through 1994, Brandywine offered various workshops and courses related to desegregation, race equity and multieulturalism.[30] Moreover, all new Brandywine teachers are required to participate in a 12-hour induction program, which includes a panel discussion on issues of multiculturalism. JA 931.
Similarly, in the 1980s, various human relations specialists and administrators trained by the Race Desegregation Assistance Cen *771 ter at the University of Pittsburgh worked with the Red Clay faculty and staff in the area of cultural diversity. DI 1936 at 635-36, 642. The record further reveals that from 1992 through 1995, Red Clay also has offered in-service training on multiculturalism. DX 79 at FL 12295, FL 12299, FL 12302, FL 12304-11, FL 12313-14, DX 80; DXC 81; DI 1939 at 1806. The court’s findings with regard to the Christiana and Colonial districts likewise are supported by the record.[31]
In light of the foregoing, we are satisfied that Appellant’s charges have no support in the record, and thus that the district court properly found that the schools have met the requirements of in-service training.
B. Reading and Communication Skills
The district court found that an affirmative and integrated reading program was instituted in each of the four districts. Coalition, 901 F.Supp. at 809. Appellant contends that the finding is clearly erroneous, because the districts “failed to show that any reading program was implemented for the purpose of remedying the negative effects of the de jure segregation as required by the 1978 Order, or that the reading programs that were implemented did not re-segregate students.” Appellant’s Br. at 26. However, although no reading program specifically targeted black students, we conclude from our review of the record that the districts nevertheless met the standard of good faith compliance with the 1978 Order.
The record indicates that a reading program was instituted in the schools in 1978, immediately following the issuance of the remedial order. JA 967. The program employed 110 reading teachers, who
worked with the classroom teacher to help with testing, interpretation of those data from the tests, selection of materials, planning of program and strategies for students who needed assistance and anything that [a] particular teacher wanted, to do to help the students within that classroom.
JA 968. Students in grades two through nine were provided assistance under the reading program if they were one year or more below reading level, as demonstrated by standardized test scores. JA 968. Students in grades ten through twelve were provided assistance if they were two years below level. Id. And supplemental reading instruction was provided daily for 30-45 minutes, depending on grade level. JA 969. For the most part, this instruction occurred in small groups within the classroom. Id. The districts combined have employed between 100 and 135 reading teachers every year since the 1981-82 school year. JA 4910-11.
Further, the court heard evidence and found facts pertaining to the reading programs in each of the four districts. With regard to the Red Clay district, for example, *772 the court credited the testimony of officials from the district[32] and found that
reading resource teachers coordinate the “HOSTS” program (Help One Student to Succeed) for reading- and writing-deficient students. Under the program, volunteer tutors work with individual children for 45 minutes per week. More than 300 students participate in the program.
[Twenty five] parent educators hired by the Parents as Teachers program teaches [sic] first-time parents in New Castle County the importance of language and reading for pre-school children. The program has been in existence since 1987. In 1993 and 1994, the focus was on teenage parents and families with multiple needs.
Coalition, 901 F.Supp. at 810 (footnote omitted). The court found similar progress in the other districts.[33]
Because these programs were meant to address the reading problems of every student, Appellant’s argument that the program resegregated students is misguided. Although the school districts have not excluded black (or white) students from the remedial reading programs to effect a racial balance,[34] the districts do deploy several different programs such as one-on-one, small group and pull-out remedial reading programs, in which reading teachers either work inside the classroom or pull a given student out of the classroom for individual attention.[35] Thus we cannot agree that the districts’ remedial reading programs have resegregated students; the basic requirement of good faith efforts to remove the vestiges of de jure segregation to the extent practicable have been met. Accordingly, the district court did not clearly err.
Appellant further contends that the school districts have “failed to show that any ‘communications skills program’ was ever implemented” in any of the districts. Appellant’s Br. at 26. However, there is no meaningful distinction between reading skills programs and communication skills programs; indeed, the 1978 Order mandates the creation of a singular “program” to teach reading and communication skills. JA 129. Likewise, testimony from school officials on this point suggests that instruction for both skills is combined.[36] Thus “reading skills” and “communications skills” are synonymous for purposes of our analysis here. Accordingly, on the basis of our foregoing discussion of reading skills and programs, we reject Appellant’s argument that the districts have not complied with the 1978 Order.
C. Curriculum
The 1978 Order required that the curriculum “emphasize and reflect the cultural pluralism of the students,” and that “all instructional materials, texts and other curriculum aids shall be free of racial bias.” JA 129. Appellant argues that the school dis *773 tricts “failed to show that [an] inclusive curriculum as required by the 1978 Order was ever actually taught in a single classroom or that efforts made were anything other than sporadic or shortlived, or that the curriculum achieved any results at all.” Appellant’s Br. at 27. This sweeping assertion does not comport with the record.
The record indicates that the Delaware Department of Public Instruction has established text selection guidelines for the districts to use in conjunction with their own guidelines to ensure racially unbiased texts and instructional materials. The Department also has adopted a Comprehensive Policy for Multicultural Education, published accompanying guidelines, sponsored multicultural education and adopted multicultural curriculum standards. See, e.g., DX 124 at FL 23147; DX 125 at FL 23172. In April 1994, consistent with these guidelines, the Department sponsored a two-day Multicultural Education Institute. DX 52.
Further, the district court made specific findings that acknowledged efforts in each of the four districts to offer a multicultural curriculum. Coalition, 901 F.Supp. at 810-12. Our review of the record reveals several exemplary programs, including the Brandy-wine district’s extensive black history curriculum in the elementary schools;[37] Christia-na’s inclusion of the minority community in the textbook selection process;[38] Colonial’s course entitled “Minorities USA”;[39] and Red Clay’s integration of cultural pluralism into the social studies, English language arts, art education and music education curriculum guides.[40]
In light of this substantial record evidence supporting the district court’s findings, we are satisfied that the court did not clearly err when it found that the schools have complied with the court order as to curricular reform.
D. Counseling and Guidance
The 1978 Order required the districts to “institute an effective and nondiscriminatory counseling and guidance program ... [to] insure that students are counseled on a racially nondiscriminatory basis” concerning post-secondary opportunities. JA 129. Appellant argues that the districts “failed to show that any effort had been made to ensure that the counseling and guidance programs attempted to prevent resegregation of students in the classroom as required by the 1978 Order or that, in fact, the counseling and guidance programs did not become vehicles for resegregation. The School System failed to show that the counseling and guidance programs achieved any results at all.” Appellant’s Br. at 26. Again, the record belies Appellant’s bold assertions.
In the spring of 1978, the New Castle district formed a committee “to follow the directive of the Court at the time [ — ] to develop a nondiscriminatory developmental guidance program for all students.” JA 770. The committee drafted guidelines, which the district adopted in the Handbook for Certified Guidance Counselors. JA 770-71. In 1981, the Department modified the guidelines for district and statewide use in the Delaware Guidance Handbook, K-12, which was itself revised in 1990 as Appendix B to the Handbook for K-12 Education. JA 770-71.
The record further establishes that, from 1981 to 1991, these Department guidelines governed counseling programs within the districts. For example, in 1990, the state directed each district to prepare “a written plan describing the guidance program for the district which is reviewed periodically and updated at least every five years.” DX 230 at D 1464. Plans for each district subsequently were drafted and approved. JA 755, 769-70, 852, 864, DX 230, DX 231, DX 232, DX 233, DX 234. The district programs described in the plans include academic, personal, social, career and life-planning counseling. JA 1137.
The court’s detailed description of the programs established in each of the districts also *774 is supported by the record. Coalition, 901 F.Supp. at 813-814. Especially mindful of alleged disparities in the Red Clay school district, we emphasize that the record clearly supports the district court’s determination that that district administers aptitude tests, provides speakers, supplies ample resource material, offers participation in various achievement programs, and facilitates an extensive college visitation program. JA 772-74.
In sum, it is clear that the State Board has adopted nondiscriminatory counseling guidelines; that all the districts have provided comprehensive post-secondary career, educational and vocational assistance; and that the districts support numerous supplementary counseling programs which encourage minorities to pursue post-secondary education. Moreover, Appellant fails to cite any instance of discriminatory counseling. Accordingly, we conclude that the court did not err in determining that this aspect of the remedial order was fulfilled.
E. Human Relations
The 1978 Order required the districts to “provide an appropriate human relations program” for “schools undergoing desegregation.” JA 130. The provision was intended to be transitional, designed to address “the various pressures which arise as a result of desegregation.” Evans, 582 F.2d at 769. Appellant argues that “[t]he School System failed to show that any human relations program was actually implemented as written ... or that any human relations program lasted for more than a brief duration or achieved any results at all.” Appellant’s Br. at 24-25. Nevertheless, the record supports the district court’s findings.
The school districts responded to the order by implementing a program involving more than 100 specially trained and certified specialists who were assigned to schools in “biracial teams.” JA 763-64. Each high school and junior high school had at least one team, and these teams were also directed to serve a number of elementary schools. Id. These specialists provided crisis intervention assistance and implemented student support programs, such as peer tutoring and counseling. JA 764-66. Because the desegregation went smoothly, the focus of the program soon shifted to multicultural awareness, problem-solving and other student support functions. JA 764. The districts continued these services by retaining human relations personnel and hiring elementary guidance counselors, social workers, community outreach personnel, visiting teachers, student advisors, student relations specialists and other student support personnel. See Coalition, 901 F.Supp. at 815-16.
Moreover, the district court described in detail the progress in each of the four districts. Again directing our focus to the Red Clay district, we note that “Red Clay employed 16 human relations specialists and home/school advisors in 1981-82 and 18 in 1982-83” and “five human relations specialists and home/school advisors” as recently as 1993-94. Coalition, 901 F.Supp. at 816 (crediting Defendant’s Exhibit 111).
Notwithstanding the necessary (and welcome) shift in the focus of the human relations program, it clearly has lasted beyond “a brief duration” and has yielded significant results. Accordingly, these findings support the district court’s determination that the school districts complied with the court order as to human relations programs.
F. Discipline
The 1978 Order required the development of a code to provide “racially nondiscriminatory discipline” and to ensure “procedural and substantive due process.” JA 130. In July 1978, the New Castle district adopted a code of conduct drafted by a “committee [which had] gathered similar documents from Delaware and large desegregated school districts for review.” JA 4436. Prior to adoption, drafts of the code were reviewed by citizen groups, student council leaders, the Teachers’ Association, and administrators. JA 4435-36. The districts adopted the New Castle code in 1981, and each district has revised the code periodically since then, through a “process of development and continual revision that includes [the] involvement of others, that includes teachers, includes administrators, and there are process *775 es for the codes to be reviewed by external sources and have input.” JA 719.
Appellant’s discipline expert concedes that the districts’ codes are not “discriminatory on their face.” JA 1157’. And the district court found that the codes “are not applied in a discriminatory fashion.” Coalition, 901 F.Supp. at 817. Appellant argues, however, that the school districts have failed to reduce racial disparities in discipline rates among students, and that Appellant was denied the opportunity to admit expert testimony in support of this claim. ■ However, on this matter the record supports the district court’s findings, as well as its exercise of discretion.
The district court’s finding that discipline is not administered in a discriminatory fashion is supported by the testimony of Dr. Charles Achilles, the school districts’ expert. Dr. Achilles calculated indices by dividing the percentage of black student suspensions by the black enrollment percentage. Based on these data, Dr. Achilles determined that the districts’ suspension indices reflected less racial imbalance than indices calculated from national suspension data compiled by the Office of Civil Rights and Delaware arrest data. JA 722-23. Dr. Achilles further illustrated that the indices were essentially consistent across the four districts — “a result difficult to achieve if equitable nondiseriminatory codes were not being used and applied in an equitable, nondiseriminatory manner.” Coalition, 901 F.Supp. at 817; see JA 724. And finally, Dr. Achilles demonstrated “consistency in how the codes were applied by administrators, regardless of the administrators’ race.” Coalition, 901 F.Supp. at 817; see JA 725. In light of this compelling testimony, we conclude that the district court did not clearly err in determining that, as to discipline, the school districts have complied with the 1978 Order. See Krasnov, 465 F.2d at 1302 (standard of review).
Nor did the district court err in rejecting the testimony of Appellant’s discipline expert, Dr. William Gordon. He could cite no study or authoritative literature to support his assumption “that ‘undiscipline’ or misbehavior is a randomly distributed characteristic among racial groups_” JA 1161. And in fact, statistical data demonstrate a comparable or greater racial disproportion for those offenses for which Delaware law mandates suspension, which Gordon called “very objective” offenses, than for those offenses he viewed as less objective. JA 726. Accordingly, we reject Appellant’s argument that the schools have failed to reduce racial disparities in discipline rates.
We likewise reject Appellant’s contention that expert testimony on this matter was improperly rejected by the district court. A trial judge’s exclusion of testimony cannot be disturbed on appeal “absent a clear abuse of discretion.” Semper v. Santos, 845 F.2d 1233, 1238 (3d Cir.1988); Fashauer v. New Jersey Transit Rail Operations, 57 F.3d 1269, 1287 (3d Cir.1995). In both Semper and Fashauer, the court upheld the exclusion of rebuttal testimony because of counsel’s failure to adhere to a pretrial order. Semper, 845 F.2d at 1238; Fashauer, 57 F.3d at 1287.
Here, Appellant disregarded two pretrial orders requiring the disclosure of the “specific subject matter as to which each expert will testify” and the provision of expert reports complying with Rule 26, Federal Rules of Civil Procedure. Denying .Appellant’s motion to delay disclosure of the identity of its experts, the district court stressed, more than three months before trial, that “[t]his is a case where the interests of justice dictate public disclosure of the parties’ experts and early resolution of any potential disputes regarding any experts’ qualifications.” JA 203, 208.
Rule 26 states that “[t]he report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor” and obligates a party to supplement the report if it “learns that in some material respect the information disclosed is incomplete or incorrect....” Fed.R.Civ.P. 26(a)(2)(B) & (e)(1). Supplementation must be made “with special promptness as the trial date approaches.” Fed.R.Civ.P. 26(e), Advisory Committee Note. Exclusion of testimony is an appropriate sanction for failure to supplement in a timely manner. See Freund v. Fleetwood Enterprises, Inc., 956 F.2d 354, 358 (1st Cir.1992).
*776 As of November 30, Appellant knew all of the State Board’s experts’ topics and methodologies. Appellant could have, but declined to, file a supplemental report for expert witness de Leeuw on December 9, as it did for three of its other experts. Appellant also could have disclosed its intent as a result of counsel’s comments at the deposition on December 15. Instead, Appellant chose the tactical route of surprise. In light of the foregoing discussion, we conclude that the district court did not abuse its discretion in excluding this surprise testimony.
VII. Areas of Concern to the District Court and Allocations of the Burden of Proof
Aside from its examination of the four school districts’ compliance with the Green factors and the ancillary relief measures, the district court also acknowledged that certain performance disparities persist in the New Castle County schools — most notably in the Red Clay district. These performance disparities include student achievement, special education, and dropout rates, and are not disputed here. However, because these disparities are not among the vestiges enumerated either in Green or in the ancillary relief order, we must determine, first, whether these disparities actually are vestiges of de jure segregation, and if so, whether the school districts have in good faith eliminated them to the extent practicable. Having considered the taxonomy of disparities proffered by Appellant and reviewed the record and pertinent legal precepts, we hold that Appellant properly was allocated the burden to prove that the disparities were vestiges, and that the Appellant failed to meet this burden.
The Court has made plain that certain disparities necessarily are vestiges of de jure segregation. Identifying what would become known as the Green factors, the Court directed school boards to propose plans designed to disestablish state-imposed segregation in “every facet of school operations — faculty, staff, transportation, extracurricular activities and facilities.” Green, 391 U.S. at 435, 88 S.Ct. at 1693. Accordingly, and as the relevant cases cited by Appellant demonstrate, the Court consistently has turned to the Green factors to “determin[e] whether a dual school system has been disestablished.” Columbus Board of Education v. Penick, 443 U.S. 449, 458-61, 99 S.Ct. 2941, 2947 — 48, 61 L.Ed.2d 666 (1979) (Green factors). See also Davis v. Board of Sch. Comm’rs of Mobile County, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971) (pupil assignment); Dayton Bd. of Educ. v. Brinkman, 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979) (pupil assignment and school construction). Indeed, the Green factors have become per se vestiges of de jure segregation — and therefore the focal point for determining unitary status. Nevertheless, the performance disparities enumerated by Appellant are not among these factors.
Still, the Green factors are not the only disparities that may be classified as vestiges of de jure segregation. Depending on the circumstances of a particular case, the trial court still may exercise discretion to consider other factors. Freeman, 503 U.S. at 492-93, 112 S.Ct. at 1446—47. The circumstances of the instant case prompted the district court, in 1978, to order eight ancillary remedial measures. As with the Green factors, we have reviewed the districts’ compliance with that order and conclude that there was a good faith effort to eliminate the vestiges identified therein to the extent practicable. Again, however, the performance disparities urged here were not identified among these vestiges of de jure segregation.
We emphasize that here we are not discussing the burden of proving compliance with the Green factors or the 1978 Order, as to which the school districts acknowledge bearing the evidentiary burden. Our discussion here, and our allocation of the burden of proof to Appellant, is limited to the issue of proving that the identified performance disparities are vestiges of de jure segregation.
Because the performance disparities claimed by Appellant are not among (or even similar to) the Green factors or the vestiges identified in the 1978 Order, we will not simply presume — as Appellant urges us to do — -that these are vestiges of de jure segregation. Appellant offers no persuasive au *777 thority for establishing a causal link between present achievement disparities and past de jure segregation. In fact, all but one of the cases relied on by Appellant on this point are irrelevant, because they address only Green-type factors; the State Board does not dispute that it carried the burden of proving good faith efforts to eliminate (to the extent practicable) such vestiges of de jure segregation.
Appellant thus can rely solely on Vaughns by Vaughns v. Bd. of Educ. of Prince George’s County, 758 F.2d 983, 990-91 (4th Cir.1985), which, upon our review, supports the district court. In Vaughns, because the school district was not unitary with respect to the Green factor of student assignment, id. at 990-91, the Court of Appeals for the Fourth Circuit held that the plaintiffs were entitled to a presumption that disparities in special education and gifted and talented programs arose from prior segregation. More important, the Vaughns court distinguished a decision from a sister circuit because “the burden shifted to [Appellants] in that ease only because the school system had achieved unitary status with regard to student assignment.” Vaughns, 758 F.2d at 991.
Here, however, the districts have been unitary as to school assignments since the 1978 order. Had the Vaughns school district satisfied the Green factors as have the Delaware districts before us, the Vaughns plaintiffs would have had to prove that performance disparities resulted from de jure segregation. The Court of Appeals for the Fourth Circuit so held in two subsequent eases. See Rich dick by Riddick v. School Bd. of City of Norfolk, 784 F.2d 521, 534 (4th Cir.), cert. denied, 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986); School Bd. of the City of Richmond, Va. v. Baliles, 829 F.2d 1308, 1312 (4th Cir.1987). The same result should obtain here.
Further, we must respect the Court’s teaching that “a school board is entitled to a rather precise statement of its obligations under a desegregation decree” and to “a like statement from the court” for when “such a decree is to be terminated or dissolved.” Dowell, 498 U.S. at 246, 111 S.Ct. at 636 (citing Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976)). Because we are reluctant to impose any unstated obligation on the school boards, we allocate the burden to prove any additional violation to the Appellant. See Jenkins, — U.S. at -, 115 S.Ct. at 2055-56 (to require a remedy, inferior student achievement must be proven to have resulted from de jure segregation); see also Keyes v. School Dist. No. 1, 902 F.Supp. 1274, 1282 (D.Colo.1995) (“The Court’s opinion in ... Jenkins ... defeats the plaintiffs’ call for compelling additional action to investigate and redress racial disparities in student achievement ... [when the] court has never made any findings that such differences are the result of discrimination by the District”).[41]
In light of the foregoing discussion, we conclude that Appellant failed to carry its burden. The district court’s finding that persistent student performance disparities were caused by socioeconomic factors is supported by the record. Coalition, 901 F.Supp. at 818-19. The district court cited various demographic data from the 1990 U.S. Census and the 1992 Vital Statistics Report of Delaware that illustrate a “blaek/white gap” in the geographic area contained in the four school districts, and in New Castle County generally, as to socioeconomic conditions.[42] *778 The record establishes that “Blacks in the desegregation area are in an inferior position economically to whites, and [that] that gap is wider in New Castle County than it is in the nation as a whole.” Coalition, 901 F.Supp. at 818.
Further, the record supports a causal link between these socioeconomic factors and student achievement across the four districts: “There is consistency between the gap in socioeconomic status with the gap in achievement, with Brandywine statistics demonstrating the greatest disparity in both areas, Colonial the least disparity.” Id. With such support in the record, these findings cannot be clearly erroneous. Anchoring its determination on these unfortunate, but uneontro-verted, socioeconomic factors, the court found, inter alia, that “[b]ecause the environment outside school is so strong, cumulative, and varied, schools cannot overcome such environmental/differences [sic] among children.” Id. at 819. We agree.
Accordingly, we affirm the district court’s allocation of the burden of proof and its determination that persistent performance disparities are not vestiges of de jure segregation.
VIII. Conclusion
The task of setting forth reasons for affirming the district court’s judgment would have been lightened considerably — and this opinion made benevolently more brief — had the Coalition not chosen to mount a scatter-gun attack on virtually every aspect of the district court’s comprehensive opinion. Indeed, the Coalition portrays nearly 20 years of federal court supervision of Delaware public education as a cheerless and sorrowful failure.[43] As our discussion has shown, however, the Coalition’s contentions, in the main, have been expressed in conclusory language that neglects to demonstrate where the district court erred and fails to appreciate the narrow standard of review by which we are constrained.
Moreover, the Coalition repeatedly has failed properly to acknowledge the importance of pervasive socioeconomic conditions that account for discrepancies among the races in educational performance. Indeed, the Coalition avoids the responsibility of carefully examining the roots of the continuing black/white achievement gap, a brutal national phenomenon first documented in the 1960s[44] and substantiated in various recent *779 studies[45] that “demonstrate that if socioeconomic characteristics are more equalized, achievement levels are more equalized.” Coalition, 901 F.Supp. at 819. These studies conclude that “[i]t is difficult for children to take equal advantage of learning opportunities absent the initial and cumulative advantages of a stimulating home curriculum,” and that “[b]ecause the environment outside school is so strong, cumulative, and varied, schools cannot overcome such environmental/differenees among children.” Id.
These conclusions support our belief, presented in the foregoing discussion, that none of the Coalition’s arguments concerning special education, discipline and dropout rates, student achievement, extra-curricular activities or disparities in college matriculation can seriously be considered without weighing the impact of critical demographic data. This the Coalition has failed to do, choosing instead to focus its primary energies on arguing for continued federal court supervision of the schools — as if a federal judge’s order could eliminate, with the stroke of a pen, broad social problems.
As humans, we acknowledge with melancholy the fact that many socioeconomic factors militate against a completely level playing field in our society. As judges, however, we are powerless to alter formidable social, economic and demographic forces and conditions over which no legal precept has control. Moreover, we are constrained to fulfill an obligation to address only those constitutional questions properly presented to us, and to show fealty to appropriate standards of review, lest we abandon the limits on judicial power that give coherence to our political system. The district court articulated the meaning of these institutional limits for this case:
[t]he continued existence of racial discrimination in our society as a whole, and the effect of that discrimination on the ability of a black child to enter school on an equal footing with more privileged white schoolmates, are not matters in dispute in this litigation.
Coalition, 901 F.Supp. at 823. Unfortunately, in its presentation the Coalition repeatedly has refused to accept the fundamental concept that this court’s scope of review is limited to determining whether the district court clearly erred in concluding that the school districts have achieved unitary status.
The history of our jurisprudence contains no true precedent for the micromanagement of school systems by the federal courts. Indeed, our authority to supervise these school districts does not stem from the Anglo-American common law tradition, in which the law evolves through judicial reasoning based on legal principle; instead, our legitimacy here derives exclusively'from the powers that inhere in equity jurisdiction, “another stream that flowed alongside the common law, whose headwaters were in the discretionary royal prerogative. Equity was a more flexible process, more unprincipled, initially quite ad hoc.”[46] Thus the jurisprudential basis for 20 years of detailed management of the Northern New Castle County school system has been, simply, a remedy framed in equity to enforce a desegregation decree.
This equitable remedy and, by definition, its jurisprudential legitimacy, were meant to have a limited lifespan. The remedy was designed to serve only as an implement for monitoring and guidance, not as a permanent substitute for state and local school boards, or indeed, for the state legislature. Thus in our zeal to insure maximum educational opportunities for all Delaware school students, the federal courts must bear in mind that the responsibility for administering the schools ultimately belongs to locally elected officials. Indeed, we must acknowledge that although it has been proper for us to supervise multiple generations of students in the service of unassailable ideals, in the process we have also denied multiple generations of elected officials the freedom to participate fully in representative government. For 20 years *780 there has been a constant colloquy between federal judges and officers of these political institutions, a score of years in which to achieve desegregation “with all deliberate speed,” as ordered in Brown II, 349 U.S. 294, 301, 75 S.Ct. 753, 757, 99 L.Ed. 1083 (1955).
In ruling that the school districts of Northern New Castle County have at long last truly respected our specific orders of desegregation, the district court has cut the umbilical cord extending from the courtroom to the classroom. Institutions that normally are free to exercise powers traditionally granted them (and them alone) in the American political process now are free to assume those powers. The time has come for the courts to step back. What Roscoe Pound said almost a century ago still is most appropriate: “[W]hen men demand too much of law, when they seek to devolve upon it the whole burden of social control, when they seek to make it do the work of the [school,] home and ... church, enforcement of law comes to involve many difficulties.”[47] The judgment of the district court declaring unitary status will be affirmed.

. That opinion was authored by Collins J. Seitz, then Chancellor of the Delaware Court of Chancery and currently a Senior Circuit Judge and Chief Judge Emeritus of this Court.

.For a comprehensive history of the litigation leading up to that decree see Evans v. Buchanan, 379 F.Supp. 1218, 1220-21 (D.Del.1974). Three years after that 1974 district court decision, this court reviewed in banc the status of the Delaware schools, and affirmed, with modifications, the remedies ordered by the district court. Evans v. Buchanan, 555 F.2d 373, 380-81 (3d Cir.1977) (in banc ) (requiring state authorities to file a "formal report of its efforts to carry out the mandate of the district court,” but modifying the strict numerical requirement on racial balance: "We expressly disapprove the 10-35% enrollment criterion, and we specifically hold that no particular balance will be required in any school, grade, or classroom”).

. The moving defendants were the Board of Education of the State of Delaware ("State Board”), and the Boards of Education of the Red Clay (Consolidated), Brandywine, Christiana and Colonial School Districts. Although not a moving defendant, the Delaware House of Representatives Committee on Desegregation was allowed to intervene as a party defendant.

. Although phrased in duplicative terms, Appellants enumerate six issues in their brief: "1. Whether the district court erred in failing to find that the School System has not restored the victims of the constitutional violation to the position they would have been in had the violative conduct not occurred, and in failing to find that the School System has not eliminated the vestiges of segregation. 2. Whether the district court erred in failing to apply the legal standard that establishes that race neutral programs are insufficient for defendants-appellees to have complied with their affirmative obligations to desegregate all aspects of the formerly de jure segregated school system. 3. Whether the district court erred in failing to apply the appropriate legal standard to determine what the vestiges of segregation are in Northern New Castle County. 4. Whether the district court erred in placing the burden of proof on the Coalition to prove that certain vestiges of segregation have been eliminated. 5. Whether the district court erred in failing to apply the appropriate legal requirements of good faith compliance with desegregation decrees. 6. Whether the exclusion of the Coalition’s expert rebuttal testimony based upon cross-examination and material produced for the first time during cross-examination, that would have undermined the methodology and conclusions of three of defendants-appellees' experts, whom the district court relied upon in making its findings, was error when such testimony should have altered the outcome of the trial.” Appellant’s Br. at 2-3.

. Indeed, every student presently in the system has been under court supervision for every year of his or her school life, and two entire generations of students from grades one through eight have been under federal court school superintendence. Although these facts alone could not justify the removal of federal supervision of the school districts concerned here, they serve to illustrate the potential for the entrenchment of this putatively transitional desegregation scheme.

. The Index of Dissimilarity indicates how races in a school district are distributed across schools. The scale extends from “0,” representing perfect racial balance, to "1," representing complete racial imbalance. The actual figure represents the proportion of black students who would have to be reassigned to white schools, assuming no whites were reassigned, in order to achieve the same proportion in each school as in the district as a whole. Thus, for example, Red Clay peaked with over a .2 ratio of racial imbalance, while Colonial had the best racial balance, indicated by its scant .05 Index of Dissimilarity between 1983 and 1986. See JA 6199-6200 n. 3.

. We note also that Dr. Leonard Stevens, an expert called by the Coalition, conceded that with respect to "traditional” schools, Brandy-wine, Christiana, and Colonial have complied with the ± 10% variance standard currently used, and have "attained building enrollments that are not racially identifiable ... [and] sustained them over a period of time.” JA 1094. Dr. Stevens conceded as well that no federal court has adopted a ± 10% standard in a unitary status hearing, and that never has he testified in a unitary status hearing in support of such a standard. JA 1099; Coalition, 901 F.Supp. at 799.
Although Dr. Stevens argued that "Red Clay [district] has failed to ... respond affirmatively to the court orders,” JA 1094, this assertion does not comport with the district court’s statements in finding 23, quoted here in relevant part:
a.3 Red Clay elementary schools fell out of balance during the 1980’s, due to demographic changes (in the case of Richardson Park and Baltz) and the presence of the bilingual education program in the Lewis School. JA 654-55.
b. In 1991, Red Clay instituted a new feeder pattern which brought all the formerly imbalanced elementary schools within the ± 10% district minority percentage. 1 elementary school was opened in 1991 and fell outside the variance for just 1 year. The Lewis School, still the center for bilingual education, fell outside the ± 10% variance in 1993. JA 655.
c. Of the 5 Red Clay middle schools, the Conrad Middle School fell outside the ± 10% variance from 1986 through 1990. The H.B. duPont Middle School fell outside the ± 10% variance from 1984 through 1990. JA 6504-OS. [Another Coalition expert,] Dr. Armor[,] attributes the increase in the Conrad Middle School to the same demographic shift that affected Baltz, i.e., a sudden large increase in the minority population in that area. JA 655. Since the reconfiguration of the feeder patterns in 1991, both schools have been within the ± 10% variance. Id.
d. 2 of the 4 Red Clay high schools have remained within the ± 10% variance since 1981. JA 6506.
e. The A.I. duPont High School was below the ± 10% variance from 1983 to 1990, with the exception of 1988. Id.
f. Wilmington High School has been within the ± 10% variance ... since 1993. Id.
Coalition, 901 F.Supp. at 799. These findings, particularly (b), indicate that the Red Clay school district has made efforts to respond affirmatively to the court desegregation mandates.

.At oral argument, Appellants conceded that the district court’s finding regarding racial balance within the district school buildings is “clearly right ... [i]f you forget about the [Intensive Learning Centers].” Transcr. Oral Argument at 63.

. See, e.g., findings 31 and 32 of the district court, Coalition, 901 F.Supp. at 799-800.

. In Brandywine and Red Clay, the percentage of black students in special education programs exceeds the overall student population by more than 17%. In Christiana, the percentage is about 12% higher. And in Colonial, the percentage is approximately 10% higher.

. In the Brandywine district, this imbalance has fallen from more than 21% in 1981-88 to less than 18%. In the Christiana district, this percentage has dropped from nearly 17% in 1981-88 to approximately 12%. The Colonial district has experienced a decline from about 12% in 1981-88 to approximately 10%. And although the gap in the Red Clay district has remained constant at nearly 17%, the percentage of minority students who leave the special education program is about the same as the total percentage of all students who leave that program. JA 3477-78; 1460-61; 2005-06.

.The district court noted expert witness Dr. Daniel J. Reschly's opinion "that with better measures of poverty ... the gap [between races in special education] would be further reduced, if not eliminated.” Coalition, 901 F.Supp. at 821 n. 45; JA 837-38, 848, 851.

. Dr. Jeannie Oakes, an expert for Appellant, has testified that she is "not comfortable about” the course selection process, because parents who are not "comfortable with the system,” usu *765 ally minorities, are unlikely to challenge a school's recommendation. Coalition, 901 F.Supp. at 800 n. 28; JA 1383. However, absent any evidence to support Dr., Oakes' assertion, it remains unsubstantiated conjecture, and thus not persuasive for purposes of our analysis.

. Finding 45 reads:
a. Approximately 81% of students in non-college prep English classes are also in non-college prep math classes. Approximately 80% of students in college prep English are also in college prep math.
b. Approximately 81% of students in non-college prep math classes are also in non-college prep science classes. Approximately 79% of students in college prep math are also in college prep science.
c. More than 80% of students in non-college prep social studies classes are also in non-college prep science classes. More than 80% of students in college prep social studies are also in college prep science.
d. More than 90% of students not in honors classes in social studies are not in honors classes in science. Less than 80% of students who are in advanced social studies are also in advanced science.
e. More than 90% of students not in honors classes in social studies are not in honors classes in English. Less that [sic] 80% of students who are in advanced social studies are also in advanced English.
f.More than 80% of students not in honors classes in science are not in honors classes in math. Less than 60% of students who are in advanced science are also in advanced math. Id. at 801.

. Expert Jeannie Oakes’ report, titled “Ability Grouping, Tracking and Within-School Segregation in New Castle County Schools,” presents evidence that “[sjtudents who are placed in lower-level courses — disproportionately African American students — consistently demonstrate lesser gains in achievement over time than their peers placed in high-level courses.” PX 2262 at 81-86. That observation is not disputed here, and is the basis of the district court's statement in finding 49.
However, Oakes uses this evidence to make the sweeping assertion that this condition is the result of "discriminatory placement practices.” Id. at 85-86. We have carefully examined Ms. Oakes’ report and find her assertion devoid of factual support. Indeed, absent evidence that specifically substantiates these "discriminatory placement practices,” Oakes’ contention is merely conclusory, presuming that the placement of a given student in a lower track on the basis of ability is per se discrimination. However, our focus is not on whether poor and minority stu- *766 denls continue to have difficulty achieving in school, but on whether these school districts have removed the vestiges of de jure segregation to the extent practicable. Our exhaustive review of the record convinces us that the district court properly found the school districts to have done so.

. That African-American children may achieve at sub-standard levels in school is indeed the product of many complex socio-economic factors. See, e.g., JA 837 (Dr. Daniel J. Reschly citing a 1991 report from the Children's Defense Fund on the relationship between poverty and "developmental delays and disabilities” in children); also, see generally Andrew Hacker, Two Nations (1992). Again, our focus as a reviewing court here is necessarily narrow and constrains us from pursuing these larger social and political questions.

. Quoted in Alexander M. Bickel, The Morality of Consent 20 (1975). This principle was reiterated by William J. Clinton at the 1990 Democratic Leadership Conference: "We believe the promise of America is equal opportunity, not equal outcomes." Reprinted in W. Henry, In Defense of Elitism 195 (1994).

. The following colloquy took place at oral argument:
The Court:
[I]s the goal of our interest in this field equality of results or equality of opportunity?
Mr. Henderson (Co-Counsel for the Coalition): Your honor, it is simply a matter of [e]quality of opportunity.
The Court:
Right.
Mr. Henderson:
We have never suggested that the measure here is ultimate equal outcomes.
Oral Arg. Transcript 23.

. The district court's finding 52 indicates that certificated staff includes "psychologists, speech and hearing therapists, educational diagnosticians and other instructional pupil support personnel.” Coalition, 901 F.Supp. at 802; JA 602.

. Courts addressing unitary status motions typically have considered faculties within ± 15 percentage point of the district-wide minority composition to be racially balanced. Indeed, recognizing the difficulty of achieving perfect balance, particularly with small elementary school faculties, some courts have applied a standard of ± 20 percentage points. See, e.g., Flax v. Potts, 725 F.Supp. 322, 326-29 (N.D.Tex. 1989), aff'd, 915 F.2d 155 (5th Cir.1990).
The New Castle County districts have exceeded these standards, achieving an unusually high degree of racial balance in their faculties. In every year since 1981, each district has met the strict *767 ±10 percentage point standard in approximately 80 percent of its schools. And in every school year since 1982, each of the four districts has met the commonly applied ± 15 percentage point standard in better than 90 percent of its schools. Coalition, 901 F.Supp. at 804; JA 665, 6545.
Indeed, in only one of the last 12 years (1991 in Red Clay) did any of the four districts have more than a single school outside ± 15, and that occurred, at least in part, because one of the schools in that district served as one of only two county-wide bilingual education centers, and thus had a disproportionate number of Hispanic teachers. Coalition, 901 F.Supp. at 804; JA 662-63.

.See JA 619 (Testimony of Director of Administrative Services for Brandywine); JA 602 (Testimony of Assistant Superintendent for Administrative Services for Christiana); JA 633 (Testimony of Assistant Superintendent of Colonial); and JA 625 (Testimony of Director of Human Resources with Red Clay).

. The Coalition were invited to participate, but declined. Also, many of the task force’s recommendations already have been implemented. JA 633.

. “Nonprofessional” or "classified” staff (what the district court labeled "classified staff") are to be distinguished from "certificated staff,” which includes teachers as well as psychologists, speech and hearing therapists, educational diagnosticians and other "instructional and pupil support personnel.” Coalition, 901 F.Supp. at 802; JA 602, 604.

. We hasten to note that Appellant first made this argument after the instant motion was filed. Indeed, the district court found that Christiana “never received a complaint with respect to its decision not to reassign classified staff,” and that Colonial only has heard complaints in the "last year or two.” Coalition, 901 F.Supp. at 803; JA 604, 646.

. See JA 753 (Testimony of Director of Educational Leadership at Brandywine); JA 739 (Testimony of Assistant Superintendent for Planning and Facility Management at Christiana); JA 743 (Testimony of the Principal of the single high school in the Colonial district); JA 679 (Testimony of the Principal of a high school in the Red Clay district).

. Id.

. At trial, the parties agreed “that the [Coalition] will not oppose [the districts'] motion for unitary status to the extent that defendants contend that they have already achieved unitary status with respect to two of the Green factors. The two are, one, transportation, and, two, facilities.” JA 647.

. Goal Two was “[t]o prepare the instructional staff to implement a student orientation program.” These orientation activities took place in the spring and fall of 1978. JA 4373, 950, DX 84.
Goal Three was “[t]o prepare principals and supervisors to manage instruction.” This was achieved by conducting an in-service education program for principals and supervisors on various dates in March and April of 1978. JA 949, 4373, 4378.
Goal Five was "[t]o prepare the cafeteria workers, custodians, school bus drivers and secretaries to deal with educational change.” This was achieved first by preparing a cadre of trainers to conduct in-service education for the cafeteria workers, custodians, school bus drivers and secretaries in the areas of cultural differences, bias/stereotyping and team building, then conducting in-service education for these employees in these areas. The former was accomplished at a March 4, 1978 training session, the latter at a session held on June 9, 1978. JA 949, 4373, 4380. All staff received this training. JA 949-50.

. DX 53 at FL 19949; FL 19955; FL 19964-66; DX 54 at FL 19885A, FL 19903; DX 55 at FL 20002-03, FL 20027; DX 56; DX 57 at FL 306, FL 369, FL 372, FL 373, FL 375-76; DX 58 at FL 415; FL 455, FL 462; DX 59 at FL 515, FL 558; DX 60 at FL 605, FL 612, FL 613; DX 62 at FL 708-10.

. From the 1988-89 school year through the 1994-95 school year, the record indicates that Christiana's Personalized Inservice Program has offered various workshops and courses relating to desegregation, race equity and multiculturalism. DX 63 at FL 14902 (1989 instruction course for developing thematic units to integrate the curriculum); DX 64 at FL 14962 (1990 course "explor[ing] the difficulties and opportunities encountered in cross-cultural communication ... for the celebration of diversity”); DX 65 at FL 15011 (workshop focusing "on developing increased awareness of ... diversity and how one can utilize the richness of human diversity to promote better understanding and communication among students and teachers in our school community”); DX 66 at FL 15061 ("using multicultural literature in the elementary classroom”); DX 67 at FL 15103-04 (teaching math through multicultural literature); DX 68 at FL 15147-48 (classes pertaining to the celebration of diversity)-
In March 1986, Colonial sponsored a 2-day workshop entitled “Fostering Good Human Relations in Culturally Diverse Settings.” The workshop was attended by approximately 180 teachers, administrators, guidance counselors, department chairs, educational diagnosticians, team leaders, student advisors and the chairs of the Teacher Liaison Committees. DX 41 at 5. In 1994, 20 teachers participated in a series of 5 workshops comprising the Gender/Ethnic Expectations and Student Achievement staff development program. The goal of the program was to assist the teachers in "improving the academic performance of all students.” DX 199 at FL 28764. And from 1992 through 1994, Colonial's Teacher Learning Center offered in-service activities and courses in a number of areas including gender/ethnic expectations, multiculturalism, student achievement, and conflict resolution. DX 75, 76.

. See, e.g., JA 918-19, 924-25 (Testimony of Suzanne Curry, director of standards and instructional delivery for the Red Clay School District, and former remedial teacher and reading coordination teacher); see also JA 941-42 (Testimony of Jean Tucker, who designed a program for ... kindergarten youngsters who were having difficulty).

. See Coalition, 901 F.Supp. at 809-10 (crediting statistical report from Data Service Center at JA 4910, regarding the Brandywine District; the testimony of Jean Tucker of the Christiana District, JA 940; and Charles Staropoli, formerly of the Colonial District, JA 799-800).

. See, e.g., JA 925 (Testimony of Suzanne Curry of Red Clay).

. JA 940-41 (Testimony of Jean Tucker of the Christiana District.)

.See, e.g., Testimony of Suzanne Curry, director of standards and instructional delivery for the Red Clay School District:
Q. To your knowledge, has there ever been the establishment of any readings [sic] or communication skills program established in order to comply with the court’s Desegregation Order of 1978? Has there ever been any reading program especially set up for that purpose or have the reading programs been fairly constant?
A. I think they’ve been fairly constant.
JA 924-25; see also Testimony of Jean Tucker of the Christiana School District:
[T]he Parents as Teachers Program ... is for first-time parents; we work with the parents until the child is three, during the home visits, that is the core of that program. We focus on the development of the child. But basically we talk about the importance of reading and language in the home and how important that is and how that gets the child ready for school.
JA 941.

. DX 135.

. JA 781-82.

. DX 148 at FL 21138-40.

.DX 154 at FL 8123; DX 155 at FL 10353; DX 156 at FL 8853, FL 9102, FL 9135; DX 157 at FL 10268; DX 158 at FL 10109; DX 159 at FL 8043, FL 8086; DX 160 at FL 7932; DX 161 at FL 7121; DX 162 at FL 7042-43, FL 7064.

. We note further that even if the school districts were to bear the burden of proving that performance disparities were not vestiges of segregation, the district court later would have found that the State Board sustained that burden:
defendants presented substantial evidence contrary to plaintiff's contention that poor performance is causally related to past de jure school segregation, thus constituting sufficient evidence to carry the burden of persuasion plaintiff seeks to impose.
JA 1454.

. a. Black households are 2.54 times as likely as white households to have a reporting householder who lacks a high school degree. JA 437, 6567.
b. Black households are 6.47 times as likely as white households to have children categorized as being in poverty. JA 548, 6569. * * *
d. 4 times as many black students as white students are eligible to participate in the federally subsided (sic) lunch program. JA 550, 670.
*778 e. Blacks are 2.86 times as likely as whites to be unemployed. JA 549, 6573.
f. Black households with children are 3.21 times as likely as white households with children to be headed by a single parent. JA 551, 6574. * * *
m. The average white student lives in a Census tract where 51% of the adults have some college education; the average black student lives in a Census tract where only 33% of the adults have some college education. JA 669-70.
n. Blacks in the desegregation area are in an inferior position economically to whites, and that gap is wider in New Castle County than it is in the nation as a whole. JA 550.
o. There is consistency between the gap in socioeconomic status with the gap in achievement, with Brandywine statistics demonstrating the greatest disparity in both areas, Colonial the least disparity. JA 885-87.

. This attitude was reflected in the following exchange at oral argument:
Mr. Henderson (Co-Counsel for the Appellant): [T]he evidence unquestionably establishes that the districts have ... perpetuated segregation, inequality and educational harm.... The segregation and inequality has been perpetuated within the schools in virtually all aspects of schooling.
The Court:
Are you saying that nothing has been done?
Mr. Henderson:
In essence. Your Honor, beyond building enrollment, which was only one aspect of the Court's examination of the Green factor of student assignment, yes, that’s what I’m saying, Your Honor.
Transcript of Oral Argument at 15 and 17. As our discussion above has shown, the record belies counsel’s assertion.
At a minimum, the Coalition’s extravagant language would be more appropriate as political rhetoric than as courtroom advocacy. What is more, if we were to accept such exaggeration, it would be foolish for us to allow such a debacle to continue: If 20 years of federal court micromanagement of the school system has been such an unmitigated disaster, we should, without any further discussion, return supervision of the schools to locally elected officials, for certainly they could do no worse.

. The district court cites the "Coleman Report,” titled "Equality of Educational Opportunity,” which was "commissioned by the Civil Rights Act of 1964 and was one of the first studies of the equality of educational opportunity in the country.” Coalition, 901 F.Supp. at 819 n. 42.

. The district court observes that "[t]he record noted several [such] studies,” including that of Dr. Herbert Walberg, which identifies nine factors affecting educational productivity and divides these factors into three broad categories— “student aptitude,” “instruction" and "psychological environments.” Id. at 819.

. Alexander M. Bickel, The Least Dangerous Branch 250 (1962).

. Roscoe Pound, Address Before the Pennsylvania Bar Association, 22 Penna. Bar Assoc. Report 221 (1916).